T.I. v R.I. (2024 NY Slip Op 24090)

[*1]

T.I. v R.I.

2024 NY Slip Op 24090

Decided on March 20, 2024

Supreme Court, Kings County

Sunshine, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 20, 2024
Supreme Court, Kings County

T.I., Plaintiff,

against
R.I., Defendant.

Index #: XXXXX

Ruchama Leah Cohen, Esq.
Sanctuary for Families
Attorney for Plaintiff
30 Wall Street, Fl 8
New York, New York 10005
Tamara Harris, Esq.
Buchanan Ingersoll and Rooney PC
Attorney for Defendant
6854 Austin Street, Ste 405 Forest Hills, New York 11375

Jeffrey S. Sunshine, J.

Introduction
This Court is called upon to determine if the parties' marriage is recognized in the State of New York notwithstanding they never obtained a civil marriage license and a religious tribunal has now purported, eight (8) years later, to have annulled the religious marriage on application of the husband based upon the religious concept of concealment of mental illness and that the clergy who performed the marriage may not have been authorized to do so. In doing so, the Court must determine jurisdiction utilizing neutral principles of law recognizing that there is also a young child born during the marriage who is affected by the determination. 
The Court must also determine if a respondent-father in an Article 10 proceeding, who consented to a finding and an order of protection, can prevail on his claim that the Article 10 application precludes the petitioner-mother herein from seeking an order of protection on her behalf and her child in this Matrimonial action. 
The Court must examine the Constitutional law arguments put forth by both parties and the State's interest in the presumption of marriage in determining whether, under the facts and circumstances presented here, the State of New York recognizes a marriage solemnized between the parties pursuant to DRL 12 separate from any religious marriage and/or any subsequent invalidation of that religious marriage. The Court must make it clear that it is not ruling on the efficacy of the actions of the religious tribunal. It is only ruling on the validity of the marriage as it relates to DRL 12 within the context of the constitutional limitations and the First Amendment.
This is the second divorce action between these parties who participated in a religious solemnization ceremony pursuant to DRL 12 in March 2014 and executed a ketubah [religious marriage contract] but never obtained a New York State civil marriage license pursuant to DRL 13. 
The husband commenced the prior divorce action in 2015: that extremely contentious litigation continued until late-2018 when the Court issued an extensive written decision resolving all custody and financial issues between the parties and directed that the judgment of divorce be submitted. After the trial decision was issued, the parties notified the Court that they had reconciled. 
The parties, through counsel, filed a written stipulation to discontinue the action with prejudice after the Court set the issue of discontinuance down for a court appearance. The Court, given the issues in that case, conducted a lengthy allocution of the parties on that stipulation to discontinue on the record. 
The husband now seeks that the Court dismiss this second action for divorce, filed by the wife, because, he contends, in November 2022, nearly a decade after the solemnization [*2]ceremony, he sought and obtained an "invalidation" of the parties' religious marriage from a rabbinical court so there is no longer any marriage between the parties recognized by the State of New York and, as such, there can be no divorce action. 
The husband contends that the rabbinical court invalidated the parties' religious marriage on two Jewish religious concepts: 1) based upon "concealment" because the wife did not disclose her alleged mental health history to him prior to the religious solemnization ceremony; and 2) because the person who conducted the solemnization ceremony was not, although unknown to the parties, authorized to do so by at least some portion of the religious community. 
The Prior Action

The husband commenced a prior divorce action in December 2015. There is one (1) child of the relationship between the parties born in October 2015.[FN1]
 
In the prior divorce action, the husband represented under oath that the parties were married in a religious solemnization ceremony in Kings County, New York in March 2014 (see R.I. v. T.I., 60 Misc 3d 1226(A) [Kings County, August 17, 2018]). The prior divorce action was vigorously litigated before this Court for more than three (3) years during which neither party alleged that there was not a valid marriage.
In the written decision after trial dated August 17, 2018 in that prior action, the wife was awarded custody of the parties' then young child (whom the husband initially refused to acknowledge as his own), as well as spousal maintenance, child support and equitable distribution of considerable financial assets[FN2]
 [NYSCEF #74; id.] and the Court also addressed the husband's refusal to give the defendant-wife a Get, a Jewish religious divorce.[FN3]
 Based on the outstanding issue of the Get, the Court directed that either party may settle findings of fact and conclusions of law and a judgment of divorce with a copy of the decision after trial within sixty (60) days. Neither party submitted a proposed judgment of divorce. Instead, in November 2018, the parties through counsel notified the Court that they were reconciling and entered into a written stipulated to discontinue the action with prejudice. The Court extensively allocuted the [*3]parties on the record as to that stipulation. Both parties, who were represented by counsel averred during that allocution that they were each seeking to withdraw their applications for divorce and that they did so of their own free will [NYSCEF #15]. 
The wife now contends that she was "manipulated by Defendant and pressured by my community to refrain from finalizing the divorce" [NYSCEF #34]. She contends in her affidavit dated July 13, 2023 that after the parties reconciled "Defendant escalated the financial, verbal, emotional, physical and sexual abuse and coercive control in which he had engaged before our separation" including in the presence of the child. She avers that she was "hospitalized multiple times as a result of Defendant's abuse" both before the prior action and after that action was discontinued [NYSCEF #34].[FN4]

The counsel who represented the parties in the prior action are not the counsel who represent the parties in the action now before the Court. 
The Current Litigation

After the withdrawal of the first divorce action there was extensive Family Court litigation between the parties prior to the wife commencing the present divorce action, including the wife's petitions for child support and custody and an Article 10 abuse and neglect proceeding filed by ACS against the husband. In September 2022, the husband waived his right to trial in a Family Court Act Article 10 proceeding and consented to a finding of neglect due to domestic violence he perpetrated in front of the parties' child. 
On February 7, 2023, the wife commenced this action for divorce in Kings County Supreme Court [NYSCEF #24]. Family Court issued a temporary order of basic child support payable by defendant-husband to the plaintiff-wife. On June 1, 2023, defendant filed a verified answer [NYSCEF #14]. On June 20, 2023, Family Court granted plaintiff-wife's application to keep her address confidential [NYSCEF #27].
Plaintiff-wife is currently employed as a physician's assistant. She is thirty-eight (38) years old. Defendant-husband is a physician. He is currently forty-seven (47) years old (about to turn 48 years old). 
On August 2, 2023, the wife's counsel filed an order to show cause seeking pendente lite relief" [NYSCEF #59; motion sequence #4] including, inter alia, maintenance. On August 28, 2023, the husband filed a substitution of counsel relieving his prior counsel and substituting in counsel. [NYSCEF #64].[FN5]

A preliminary conference was scheduled for September 19, 2023 before the previously assigned Justice; however, due to an emergency application and motions filed thereafter, the preliminary conference was not conducted and was held in abeyance pending determination of the applications herein inasmuch as defendant contends that there is no basis for the Supreme Court to hear the wife's action for divorce.
November 14, 2023
On November 14, 2023, the wife filed an "Order to Show Cause For Temporary Order of Protection" [NYSCEF #98; motion sequence #5] seeking stay away orders of protection for herself and the parties' child and requesting that any visitation between the child and the husband be limited to supervised therapeutic visitation.
On the same day, the husband filed a cross-motion [NYSCEF #84; motion sequence #6] seeking "an order granting summary judgment and dismissing this divorce action, and for leave to sell- non- marital property" and in opposition to wife's order to show cause seeking pendente lite relief and opposing consolidation of the pending Family Court support petitions.[FN6]
 
The following day, on November 15, 2023, the case was transferred to this Justice by written order from the previously assigned Justice because there was a prior related case before this Justice [NYSCEF #95]. The matter was scheduled for an immediate court appearance; however, thereafter, the parties mutually requested an extension of time to brief the respective applications and the matter was scheduled for oral argument on January 4, 2024 [NYSCEF #101; #108]. The matter was fully briefed and the Court heard oral argument on January 4, 2024 [the minutes are NYSCEF #135].[FN7]
 
By e-mail dated January 31, 2024, plaintiff's counsel requested an opportunity to submit a supplemental memorandum of law related to the case of Bernstein v Benchemoun (216 AD3d 893 [2 Dept.,2023]) which was raised during oral argument on the record by the Court. That application was opposed by defendant's counsel. The Court issued a written scheduling order dated February 1, 2024 granting both counsel the right to put in brief supplemental affirmations related to the case based on the "significant constitutional issues raised by the parties and in the interest of justice" [NYSCEF #136] and set a briefing schedule for any such submissions. Those documents were submitted as follows: by defendant, on February 15, 2024 [NYSCEF #138]; by plaintiff, on February 20, 2024 [NYSCEF #139].
ARGUMENTS
It is undisputed that the parties participated in a religious solemnization ceremony in March 2014 and that they both understood that they were religiously married and that that marriage was recognized by the State of New York until November 2022 when the husband sought and obtained an invalidation of the religious marriage from a rabbinical court based, allegedly, on two (2) religious principles: 1) that the wife had not disclosed her alleged mental health history to the husband prior to the solemnization ceremony [*4]resulting in a religious basis to "invalidate" the religious marriage; and 2) that the person who solemnized the ceremony had lost religious authorization to do so within that religious community even though the parties did not know about that alleged lack of authorization issue for nearly a decade. 
It is undisputed that the parties never obtained a marriage license (DRL 13).
It is also undisputed that the husband previously commenced a prior divorce action in 2015 and vigorously litigated that divorce action into 2018 before the parties reconciled and stipulated to discontinue the action with prejudice after a lengthy allocution on the record when they were both represented by counsel.
The Husband's First Argument: Invalidation

The husband contends that for the Supreme Court to become embroiled in determining the efficacy of the rabbinical court's determination to "invalidate" the parties' religious marriage would violate the First Amendment's Free Exercise and Establishment Clause. The husband contends that based on the "invalidation" of the religious marriage by the rabbinical court that the Supreme Court has no subject matter jurisdiction over the parties in a divorce action because the State of New York cannot recognize any legal marriage between the parties where the religious marriage has been invalidated [NYSCEF #86].[FN8]
 The husband's counsel argues, in effect, that any marriage between the parties "dissolved" when the husband sought and obtained a religious "invalidation" based on religious law in November 2022 of the parties' March 2014 religious marriage.
The Wife Disputes The Husband's Rendition of Her Mental Health
The wife disputes the husband's rendition of her mental health and contends that any invalidation he may have obtained from the rabbinical court was not obtained by valid means and should not be a basis to deny her a divorce of any marriage between the parties recognized by the State of New York pursuant to DRL 12.
The Religious "Invalidation" of 2014 Religious Marriage in November 2022
It is undisputed that the parties both believed the person who solemnized the religious marriage ceremony in March 2014 was authorized to do so at the time of the ceremony.
The Husband's Argument on Solemnization
The husband affirms that eight (8) years after the parties' religious solemnization ceremony he learned that the person who conducted the ceremony had "forged documents" and may not have been authorized to solemnize the ceremony by a certain religious community in Queens County [NYSCEF #102]. Defendant contends that when he sought and obtained the "invalidation" of the religious marriage from the rabbinical court based upon religious principles that ipso facto also terminated any marriage between the parties that may have been recognized by the State of New York, regardless of the parties' knowledge, understanding or intention at the time of the solemnization and notwithstanding the fact that the parties relied on their mutual understanding that they were religiously and civilly married from March 2014 until he obtained the invalidation in November 2022. [NYSCEF #97, p. 3, # 13). 
The Wife's Argument On Solemnization
The wife concedes that she had heard some "controversy" in the parties' religious community about the person who performed the solemnization ceremony but affirmed that she did not know that the person was no longer authorized to solemnize religious marriages at the time of the parties' ceremony in March 2014. She affirms that she only learned about the claim that the person was not authorized to perform the ceremony when defendant sought and obtained a religious "invalidation" of the religious marriage in or about November 2022.
The wife contends that the husband is estopped from asserting that the State of New York cannot recognize a marriage between the parties now because he previously affirmed in documents submitted to the Court both in 2015 and at the commencement of this action that the parties' marriage was recognized by the State of New York. She further argues that it is res judicata, that the parties' marriage is recognized by the State of New York because the Court previously granted the husband (who was the plaintiff in the prior action) a divorce based upon DRL 170(7).
The Husband's Contention That There is No Prejudice To The Wife
The husband argues that there is no prejudice to the wife if the Court denies her application for a civil divorce because, he argues, she is already receiving temporary basic child support of $1,016 from her Family Court support proceeding. He contends that, in commencing this action for divorce after receiving a temporary order of child support from Family Court, the wife was forum shopping and seeking a "better" child support award from Supreme Court than she received from Family Court.
The Wife Contends the Parties' Child Would Be Prejudice If The Parties' Marriage is Not Recognized by the State of New York
Plaintiff argues that the parties' child will be financially prejudiced if the Court finds that the parties' marriage is not recognized by the State of New York. She requests that the Court find that the parties' marriage is recognized by the State of New York and governed by neutral principals of New York law so that the Court can determine any [*5]issues of custody, child support, spousal maintenance, equitable distribution and her request for an order of protection in this action for divorce. The wife contends that despite the temporary order of basic child support from Family Court, an award of spousal maintenance and equitable distribution in addition to basic child support is critical to maintain the lifestyle the child would have enjoyed had the marital relationship between the parties continued.
She affirms that "[s]ince our child was born, I served as the primary caretaker of the child and maintained our home; I also helped Defendant at his private practice, without any compensation. Consequently, I forewent a full-time career during the first half of the marriage" [NYSCEF #34, p. 7]. She argues that she is "struggling to make ends meet" and that she suffers "long-term health consequences of Defendant's physical abuse, which at times has limited the hours I can work" [NYSCEF #34, p. 8]. She argues that limiting basic child support at the statutory cap on combined parental income would be unjust and inappropriate given that her "financial resources are substantially less than Defendant's" [NYSCEF #34, p. 8] and that awards of spousal maintenance and equitable distribution should be considered by the Court. 
The Religious Concept of "Concealment"
The husband contends that "in Jewish law and custom, disclosure of mental illness is a prerequisite to the validity of a marriage" [NYSCEF #97, p. 6, #41) and that non-disclosure prior to the religious marriage ceremony is a basis to, in effect, "annul" the religious marriage. He affirms that the wife "concealed this information about her mental health history at the time of the [sic] our purported wedding ceremony and ketuba [sic]." He affirms that upon seeking to invalidate the religious marriage based on "concealment" he also allegedly learned that the person who solemnized the ceremony had lost authorization to do so within at least some portion of the parties' religious community. The rabbinical decision presented by the husband provides that the religious marriage was invalidated based upon concealment but does not expressly state that the religious marriage was also invalidated based upon improper solemnization.
The rabbinical court decision, dated November 22, 2022, states that:
 [s]ince, according to R. I., T. S. concealed the fact that she suffers from mental illness and did not disclose any such information before the ceremony of Ketubah, this Rabbinical Court finds that this concealment creates a blemish in the Ketubah.
Furthermore, after investigating the basic performance of the Ketubah and other related halachic matters:
Therein, there would be a reason to render this Ketubah [marriage
certificate] void and invalid by cancellation.
She "disputes the authenticity and validity of the purported rabbinical court decision annulling the marriage between Plaintiff and Defendant" [NYSCEF #104, p. 2] and contends that the husband may have obtained the religious invalidation of the parties' religious marriage by nefarious means. The wife's counsel contends that "Defendant either fabricated the annulment decision or orchestrated the rabbinical court proceeding and backdated the decision as retaliation [NYSCEF #104, p. 2]. She argues that "the marriage at issue here cannot be voided simply to serve Defendant's litigation objections" [NYSCEF #104, p. 4]. She argues that "[t]he First Amendment to the United States Constitution cuts [sic] against Defendant, not Plaintiff, on this issue" because civil courts cannot use religious decisions to assess whether there is a marriage recognized by the State of New York [NYSCEF #104, p. 6]. 
THE LAW
The First Amendment
The First Amendment to the United States Constitution provides inter alia that Congress "shall make no law respecting an establishment of religion or prohibiting the free exercise thereof." The "Free Exercise Clause" of the First Amendment applies to the states through the Fourteenth Amendment's Due Process Clause (see Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). 
The United States Supreme Court has ruled that the court is prohibited from resolving "controversies over religious doctrine and practice." Presbyterian Church of U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 [1969]; see also First Presbyterian Church of Schenectady v. United Presbyterian Church in U.S., 62 NY2d 110, 116, 476 N.Y.S.2d 86, 464 N.E.2d 454 [1984].
In Congregation Yetev Lev D'Satmar, Inc. v. Kahana, the New York Court of Appeals held that the court may not determine ecclesiastical matters which in that case would have required the court to decide whether a particular congregant "follows the ways of the Torah" (9 NY3d 282, 287—88, 849 N.Y.S.2d 463, 879 N.E.2d 1282 [2007]).
First Amendment Limitation on Civil Courts:
Religious Disputes
In Bernstein v Benchemoun, the parties were arguing whether their religious marriage was recognized by the State of New York pursuant to DRL 12 where there was no civil marriage license pursuant to DRL 13 (216 AD3d 893 [2 Dept.,2023]). One party argued that the marriage was solemnized in New York when the parties executed a second ketubah [a Jewish marriage contract] in New York after executing a prior ketubah in Florida; however, the rabbi who supervised the execution of the second ketubah in New York testified that he could not have solemnized a marriage because the parties were already married under Jewish law with the first ketubah (id.). The issue for the Court in Bernstein, was that the first ketubah was executed in Florida and, it was undisputed, the parties' ceremony had not resulted in a legally recognizably civil marriage [*6]based upon the specific marriage requirements in the State of Florida which, unlike the State of New York, required a civil marriage license issued by the State before any marriage is recognized. The Appellate Division, Second Department held that "[a] finding that there was a solemnized marriage would require an analysis of religious doctrine, which could offend the First Amendment of the United States Constitution" and upheld the dismissal of the divorce action on the basis that the parties were not married (216 AD3d 893, 894 [2 Dept.,2023]). In Bernstein, opposite to the facts presented here, there was a religious doctrine question presented in whether or not the subsequent ketubah executed in New York was valid.
In the facts before this Court, it is undisputed that the parties both believed their marriage was recognized by the State of New York as of March 2014 and relied on that understanding for almost a decade.
The First Amendment argument raised by the husband is misplaced under the facts and circumstances presented. Here, the issue presented to this Court does not involve a religious question or ecclesiastical matter inasmuch as the Court need not determine any religious question, such as the validity of the "invalidation" of the religious marriage obtained by the husband. For this Court to become embroiled in the religious questions surrounding whether the person who solemnize the religious ceremony was authorized to do so and, importantly, whether the subsequent invalidation of a religious marriage more than eight (8) years later by the rabbinical court would offend the First Amendment because it would require "an analysis of religious doctrine" (Bernstein v Benchemoun, 216 AD3d 893, 894 [2 Dept.,2023]; see also Presbyterian Church of U.S. v. Mary Elizabeth Blue Hull Mem. Presbyterian Church, 393 U.S. 440, 449, 89 S.Ct. 601, 21 L.Ed.2d 658 [1969]; see also First Presbyterian Church of Schenectady v. United Presbyterian Church in U.S., 62 NY2d 110, 116, 476 N.Y.S.2d 86, 464 N.E.2d 454 [1984]; Congregation Yetev Lev D'Satmar, Inc. v. Kahana, 9 NY3d 282, 287—88, 849 N.Y.S.2d 463, 879 N.E.2d 1282 [2007]). This Court will not and need not address the religious question of whether the person who conducted the ceremony was authorized to do so at the time: such is a religious question that may be determined by a rabbinical court. 
Under the facts and circumstances here, which appears to be one of first impression, the Court need not make any determination about religious doctrine nor opine on the efficacy of the husband unilaterally seeking and obtaining an invalidation of the religious marriage from the rabbinical court based upon the wife's alleged mental health history. Nor will the Court act as an appellate authority over the rabbinical court which the Court clearly has no authority to do (see generally Presbyterian Church of US v Mary Elizabeth Blue Hull Mem Presbyterian Church, 393 US 440 [1969][Court is prohibited from resolving "controversies over religious doctrine and practice"]; also Congregation Yetev Lev D'Satmar, Inc. v Kahana, 9 NY3d 282 [2007][holding that state court is barred by the First Amendment from interpreting religious law or acting as appellate authority over a religious tribunal and has no authority to overrule religious determinations made [*7]by a rabbinical court]). 
Nothing related to the wife's request for a civil divorce requires this Court to address or assess the religious issues that the husband brought before the rabbinical court or that may have been part of the rabbinical court's determination and, as such, the husband's theory that the issue of whether the wife can seek a divorce of any marriage recognized by the State of New York is not prohibited by the First Amendment. Here, the determination of whether a marriage recognized by the State of New York exists between the parties separate and apart from any religious marriage rests not upon religious doctrine but upon neutral principles of law.
Any religious determinations and any ramification of religious doctrine made by the rabbinical court as to the parties' religious marriage are separate and apart from the Supreme Court's jurisdiction over whether, based on neutral principles of law, there exists here a marriage recognized by the State between the parties. 
The question before this Court is whether the State of New York continues to recognize a marriage between the parties separate and apart from any unilateral change to the status of the religious marriage between the parties obtained by the husband more than eight (8) years after the solemnization ceremony. The wife only seeks a civil divorce from a marriage recognized by the State of New York pursuant to DRL 12: she is not seeking to enforce against the husband any religious practice arising out of principles of religious law (see generally Avitzur v Avitzer, 58 NY2d 108 [1983][holding that the case could be decided solely on application of neutral principles of contract law without reference to any religious principles where party sought to compel defendant to perform a secular obligation to which he contractually bound himself in the parties' religious marriage contract [the "ketubah"] so there was no constitutional barrier to the relief sought). 
Under well-established Constitutional doctrine, this Court does not have jurisdiction to adjudicate any religious or ecclesiastic doctrine questions surrounding alleged invalidation of the religious marriage between the parties, this Court has independent jurisdiction to adjudicate any secular obligations that may flow from any marriage recognized by the State of New York that may exist separate and apart under DRL 12 from any religious doctrine questions (see generally Avitzur, at 114-115; see also Fischer v Fischer, 237 AD2d 559 [2 Dept.,1997]; see also Schwartz v Schwartz, 79 AD3d 1006 [2 Dept.,2010]["the relief sought by [the wife] is simply to compel [the husband] to perform a secular obligation to which he contractually bound himself"]). 
In seeking a divorce of the parties' marriage recognized by the State of New York, the wife merely seeks to compel the husband to meet any secular obligations he may have that may arise out of any marriage recognized by the State of New York that continues independently of any change to the status of the religious marriage. As such, there is no question before this Court that would violate the First Amendment.
Domestic Relations Law 12: Solemnization
The Domestic Relations Law generally requires persons intending to be married to obtain a marriage license (DRL 13); however, aligning with the strong presumption favoring the validity of marriages, New York State, unlike some other States, holds an expansive not restrictive approach to recognizing religious solemnized marriages (DRL 12) even where the parties never obtain a marriage license pursuant to DRL 13 where both parties consented to the marriage (DRL 10) at the time of the solemnization (see Yusupov v Baraev, 187 AD3d 538, 539 [2 Dept.,2021]; see also Jayaram v Jayaram, 205 AD3d 612, 612-613 [2 Dept.,2022][upholding the validity of marriage where the parties on the date of their religious ceremony instead of the date of their subsequent civil wedding where they "participated in a solemn marriage ceremony officiated by a Hindu clergyman in which they exchanged vows, they were married on that date, regardless of their failure to procure a marriage license until some months later in a civil ceremony in New York"]).[FN9]

Domestic Relations Law 10 provides:
Marriage, so far as its validity in law is concerned, continues to be a civil contract, to which the consent of parties capable in law of making a contract is essential.[FN10]

Domestic Relations Law 12 provides:
No particular form or ceremony is required when a marriage is solemnized as herein provided by a clergyman or magistrate, or one-day marriage officiant as designated by a town or city clerk pursuant to section eleven-d of this article, but the parties must solemnly declare in the presence of a clergyman, magistrate, or such one-day marriage officiant and the attending witness or witnesses that they take each other as spouses. In every case, at least one witness beside the clergyman, magistrate, or such one-day marriage officiant must be present at the ceremony [emphasis added].
The preceding provisions of this chapter, so far as they relate to the manner of solemnizing marriages, shall not affect marriages among the people called friends or quakers; nor marriages among the people of any other denominations having as such any particular mode of solemnizing marriages; but such marriages must be solemnized in the manner heretofore used and practiced in their respective societies or denominations, and marriages so solemnized shall be as valid as if this article had not been enacted.
There is a plethora of case law in New York State addressing issues of religious [*8]marriages and various factors impacting civil jurisdiction.[FN11]
 
There is no requirement in DRL 12 that the religious solemnized marriage continue for a certain duration of time before that marriage is recognized by the State of New York.There is also no requirement in DRL 12 that the religious solemnized marriage continue as a predicate for the State of New York to continue recognizing the underlying marriage. In fact, a party to a divorce action can grant a "Get" during an ongoing divorce action and that does not "terminate" the need for the divorce action to dissolve the marriage recognized by the State of New York. Rather the State of New York recognizes that, upon solemnization pursuant to DRL 12, two (2) separate yet equally recognizable marriages exist: the religious marriage recognized by the parties' religious community and a separate marriage that is recognized by the State of New York [the "civil marriage"].
The parties submitted sworn affidavits in this and in the prior divorce action averring that they recognized their religious marriage as legitimate at the time that they entered into it and that they continued to recognize it as legitimate for nearly a decade. Consistent with the Appellate Division, Second Department decision in In re Farraj, 72 AD3d 1082 [2 Dept.,2010], the parties had a justifiable expectation that their marriage was recognized by the State of New York pursuant to DRL 12 "since they participated in a formal marriage ceremony" in accordance with their religious traditions to the best of their knowledge. 
In upholding the trial court's determination that the parties' marriage was recognized by the State of New York in In re Farraj, the Appellate Division, Second Department affirmed the Surrogate's Court explanation that marriage is a unique contract and status:
 it has long been recognized that a marriage is not merely an ordinary contract. Wade v. Kalbfleisch, 58 NY 282, 284 (1874) ("[Marriage] is more than a contract ... It partakes more of the character of an institution regulated and controlled by public authority, upon principles of public policy; for the benefit of the community."). Marriage creates a personal status that carries with it non-transferable rights, duties, and obligations that are recognized and imposed by the state. Wade, 58 NY at 285 ("Neither the rights, duties nor obligations created by or flowing from [marriage] can be transferred, and the action scarcely resembles, in its main features, an action upon contract."). Marriage works as an important social institution that provides a cultural and religious infrastructure fundamental to our society. See Fearon v. Treanor, 272 NY 268, 272 (1936) ("It constitutes an institution involving the highest interests of society. It is regulated and controlled by law based upon principles of public policy affecting the welfare of the people of the State."). (In re Farraj (23 Misc 3d 1109(A), *2 [Surrogate's Court, Kings County 2009], aff'd 72 AD3d 1082 [2d Dept 2010]).
Strong Presumption Favoring Validity of Marriage in New York:
Especially Strong Where There Are Children
In the State of New York there is a strong presumption favoring the validity of marriages (see Fisher v Fisher, 250 NY 313 [1929]; see also In re McDonald, 276 AD2d 631 [2 Dept.,2000]; see Apelbaum v Apelbaum, 7 Ad2d 911 [2 Dept.,1959]; Fisher v Fisher, 250 NY 313, 317 [1929]["Every presumption lies in favor of the validity of marriage."; Hynes v. McDermott, 46 Sickels 451 [1883]["The presumption of marriage, from a cohabitation, apparently matrimonial, is one of the strongest presumptions known to the law. This is especially true in a case involving legitimacy. The law presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardy. Where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence."]). 
While Fisher was decided more than 140 years ago, the presumption of marriage continues to be a foundational aspect of New York law and is especially strong where "the legitimacy of children is concerned" (see Spalter v. Spalter, - NYS3d -, 2024 WL 367147 [1 Dept.,2023][February 1, 2024]).
This presumption of marriage is so strong in the State of New York that in the recent decision in Spalter v Spalter, Appellate Division, First Department upheld the trial court's determination that there was a valid marriage where the parties participated in a religious solemnization but never obtained a marriage license pursuant to DRL 13 even where the parties entered into a written agreement expressly stating that they did not intend to have their religiously solemnized marriage recognized as a marriage by the State of New York (- NYS3d -, 2024 WL 367147 [February 1, 2024]).
In Spalter, the parties took part in a religious solemnization ceremony and they executed a ketubah [a Jewish wedding contract] in the presence of two (2) witnesses. They also executed an arbitration agreement which referred to them as "husband-to-be" and "wife-to-be" in which they authorized the Beth Din [a rabbinical court] to preside over marital disputes. The parties also executed a separate document stating that they were entering into a religious "marriage that is binding under Jewish law" but agreeing that the marriage would not be "legally recognized" under New York law as a civil marriage (see Spalter, supra). The parties never obtained a marriage license pursuant to DRL 13 and held themselves out as single including filing "unmarried" on tax returns and lived separate lives. 
When one of the parties subsequently commenced an action for divorce the other party argued that there was no marriage recognized by the State of New York because the parties only entered into the religious solemnized marriage to facilitate their children's acceptance into day schools and the family into synagogues. The parties had two children together when the solemnization ceremony took place: by the time the divorce action was filed they had four children (id.).
The Appellate Division, First Department upheld the trial court determination that the parties' marriage was recognized by the State of New York finding that the [*9]solemnization requirement of DRL 12 was satisfied. The Appellate Division, First Department noted that DRL 12 provides, as relevant, that "[n]o particular form or ceremony is required when a marriage is solemnized as herein provided by a clergyman" if the parties "solemnly declare" in the "presence" of clergy and at least one other witness that "they take each other as spouses" (id. at 1). The Appellate Division, First Department further found that:
 the parties may not have intended to have their marriage legally recognized under New York law is not dispositive because "while marriage is a contract between two consenting individuals, it is a special status governed by laws and the State and not determined by those entering the contract" (S.F. v. J.S., 80 Misc 3d 1218[A], 2023 NY Slip Op. 51033[U], *4, 2023 WL 6382637 [Sup. Ct., NY County 2023]; see also Alan D. Scheinkman, Prac Commentaries, McKinney's Cons Laws of NY, Domestic Relations Law § 10 ["marriage is more than a mere contract; once the contract of marriage is executed, a relationship is created between the parties which is regulated by law"]) (Spalter, at *2).
The Appellate Division, First Department's decision in Spalter highlights how strong the presumption of marriage is in the State of New York: finding that there was a marriage recognized by the State of New York even where the parties expressly stated in a signed agreement that they do not intend for their solemnization ceremony to result in a marriage recognized by the State of New York and that the State of New York's interest in the special relationship of marriage is so strong that it is proper for the relationship to be regulated by law notwithstanding the parties' intention not to be civilly married particularly where children are involved.
Parties cannot avoid the obligations and liabilities that result from a marriage recognized by the State of New York even where they attempt to limit their union to a religious marriage and to, in effect, "write themselves out" of DRL 12 (id.). The statutes and well-established case law protecting the State of New York's expansive and inclusive policy of providing solemnized marriages with the protections — as well as the obligations — of civil marriage is articulated in Spalter.
Here, there is no factual dispute that the parties solemnly declared their intent to marry before witnesses and a person they believed, at the time, was authorized to solemnize their marriage and the parties understood themselves to be religiously married and that their marriage was recognized by the State of New York for nearly a decade. Even defendant did not dispute the parties' marital status until November 2022 when he sought and obtained the religious invalidation after the plaintiff commenced support and custody petitions against him in Family Court.
Late Discovery of Possibly Improper Solemnize:
Who is Clergy?
The husband's theory that because the person who solemnized the ceremony in March 2014 may not have been authorized to do so by a specific portion of a religious community is  under the facts presented, including that the parties themselves did not know this for many, many years  insufficient to override the strong presumption of marriage as detailed above. 
Religious Corporation Law 2
Section 2 of the Religious Corporation Laws broadly defines "clergyman" as:
The term "clergyman" and the term "minister" include a duly authorized pastor, rector, priest, rabbi, pandit, swami, guru, granthi, imam, moulvi, maulana and a person having authority from, or in accordance with, the rules and regulations of the governing ecclesiastical body of the denomination or order, if any, to which the church belongs, or otherwise from the church or synagogue to preside over and direct the spiritual affairs of the church or synagogue.
This is consistent with the strong public policy in New York State to recognize marriage. It is undisputed that at the time of the ceremony the parties believed the individual who solemnized the ceremony was a "person having authority from, or in accordance with, the rules and regulations of the governing ecclesiastical body of the denomination or order, if any" to solemnize the marriage ceremony (see also generally In re Silverstein's Estate, 190 Misc. 745 [Bronx County, 1947]). 
Excusable Procedural Defects with Solemnization Not Always Dispositive
The State of New York, offering inclusive methodologies to marriage, has never required strict compliance with a detailed set of procedures for parties seeking to marry as highlighted in Fisher v. Fisher, where the Court of Appeals stated that:
[a] formal ceremony of marriage, whether in due form or not, must be
assumed to be by consent, and, therefore, prima facie a contract of
marriage " (Fisher, 250 NY at 316 [emphasis added]). 
To hold that an unknown procedural defect with the authorization of the person who solemnized the ceremony, where that alleged defect was not known to the parties and where the parties clearly intended to enter into a solemnized marriage, to be more important than the strong presumption of marriage, would not be to favor marriage where there was, at the time of the solemnization, an express intent to marry.
The Court notes that the Appellate Division, Second Department has upheld the validity of marriage where the person who performed the solemnization had not strictly complied with registration requirements (see Shamsee v Shamsee, 51 AD2d 1028 [2 [*10]Dept.,1976]. In Shamsee, the Muslim qadi who solemnized the "rites of matrimony" between the parties had not properly registered with the City Clerk of the City of New York. In rejecting defendant's application for a judgment declaring the invalidity of the marriage on the ground that the person who solemnized it was not authorized to do so, the Appellate Division, Second Department, noting that after almost twenty (20) years of marriage and only when the plaintiff sought a divorce did the defendant allege that the marriage was a nullity, found that the procedural defect in registration was insufficient to invalid the marriage (Shamsee, 51 AD2d at 1028). 
Similarly, here, any alleged defect in the authorization of the person who solemnized the parties' 2014 ceremony was — it is conceded by both parties  unknown to them at the time of the ceremony. Defendant, by his own admission, only learned about the alleged defect when he sought out invalidation of the parties' religious marriage in 2022. 
In the case at bar, the parties believed their marriage was recognized by the State of New York and lived as such for many years. Even assuming, arguendo, that the authorization defect was sufficient for the rabbinical court to invalidate the religious marriage that does not require the State of New York to adopt the same standard in determining whether the parties' solemnization ceremony resulted in a separate marriage recognizable by the State of New York given the well-established United States Constitutional and New York State case law about the "peculiar character" of the marriage relationship and the State's role in marriage.[FN12]

Marriage: A Relationship of "Peculiar Character"
and Subject to "Peculiar Principles"
It is well-established under both United States Constitutional case law and the case law of the State of New York that marriage is more than a contract solely between two people that they can unilaterally alter: once parties marry there is a relationship between them that is regulated by law and that holds the parties to various obligations and liabilities and is not dependent solely on the parties (see Maynard v Hill, 8 S.Ct. 723 [1888]). In Maynard v. Hill, the Supreme Court of the United States found that:
Marriage, as creating the most important relation in life, as having more to do with the morals and civilization of a people than any other institution, has always been subject to the control of the legislature. That body prescribes the age at which parties may [*11]contract to marry, the procedure or form essential to constitute marriage, the duties and obligations it creates, its effects upon the property rights of both, present and prospective, and the acts which may constitute grounds for its dissolution (id.at 726).
The Supreme Court of the United States continued in Maynard v. Hill by finding that:
The consent of the parties is of course essential to its existence, but when the contract to marry is executed by the marriage, a relation between the parties is created which they cannot change. Other contracts may be modified, restricted, or enlarged, or entirely released upon the consent of the parties. Not so with marriage. The relation once formed, the law steps in and holds the parties to various obligations and liabilities. It is an institution, in the maintenance of which in its purity the public is deeply interested, for it is the foundation of the family and of society, without which there would be neither civilization nor progress (id. at 729). 
The United States Supreme Court decision in Maynard and its progeny established that a parties' marital relationship, including obligations and liabilities, is not dependent solely on the parties' understandings, preferences or desires. Once a marriage recognized by the State is found to exist the parties are bound in a peculiar relationship with the State.
The State's interest and involvement in the legal aspect of the marital relationship between parties seeking to enter the legal status of marriage has a long history including many notable cases. Regardless of how these many landmark decisions are viewed from our current historical vantage, the underlying principle remains consistent: the State retains a constitutionally protected role in determining, among other things how people can civilly marry, whether they can civilly divorce and how any such civil divorce can take place. 
The legal principle of the special nature of the marital contract found in Maynard was later highlighted by the New York State Court of Appeals in Fearon v. Treanor, noting that "[i]n this state marriage is considered a civil contract, but of a peculiar character and subject to peculiar principles" (272 NY 268, 271 [1936]). Marriage may be formed by contract between the parties, but thereafter the parties to the "marriage contract" are precluded from contracting to alter or dissolve the marriage without involving the State by General Obligations Law 5-311 which specifically provides that:
 a husband and wife cannot contract to alter or dissolve the marriage or to relieve either of his or her liability to support the other in such a manner that he or she will become incapable of self-support and therefore is likely to become a public charge. An agreement, heretofore or hereafter made between a husband and wife, shall not be considered a contract to alter or dissolve the marriage unless it contains an express provision requiring the dissolution of the marriage or provides for the procurement of grounds of divorce.
Once a marriage recognized by the State of New York is formed, whether by obtaining a marriage license (DRL 13) and complying with DRL 25 or by a solemnization ceremony pursuant to DRL 12, that marriage exists as a separate legally recognizable relationship, is protected by and subject to civil law and a party cannot unilaterally "invalidate" that marriage and avoid any resulting "obligations and liabilities", as described by the United States Supreme Court, that result from the marriage (see Maynard at 729).
The State of New York, unlike some States, recognizes marriages from religious solemnization ceremonies with the understanding that the intentional and voluntary act of taking someone as a spouse in a public solemnization ceremony demonstrates to each other, to the State and to the public of a mutual intent to lawfully marry. The case before this Court highlights this principle: here, whether the State of New York recognizes the parties as married rests not on the parties' understandings, beliefs, or preferences or on whether they continue to be religiously married or whether the husband successfully sought and obtained an invalidation of that separate religious marriage but whether the State of New York, based on the "peculiar character" of the marital relationship, continues to recognize the parties, who had a child during the marriage, to be in a marriage recognized by the State of New York.
Divorce of A Marriage Recognized by State
It is well-established that New York State recognizes that granting a divorce of a marriage recognized by the State is not simultaneous with the parties obtaining a religious divorce. To that end, DRL 253 requires any plaintiff seeking to annul a marriage or for a divorce to[FN13]
:
 allege, in his or her verified complaint: (i) that, to the best of his or her knowledge, that he or she has taken or that he or she will take, prior to the entry of final judgment, all steps solely within his or her power to remove any barrier to the defendant's remarriage following the annulment or divorce; or (ii) that the defendant has waived in writing the requirements of this subdivision.
It is well-established that the Supreme Court can grant a divorce in a marriage recognized by the State but that it has no constitutional authority to terminate religious marriage or to force a defendant to provide a religious divorce to a plaintiff (see generally Margulies v Margulies, 42 AD2d 517 (1 Dept.,1973); see also Pal v Pal, 45 356 NYS2d 672 [2 Dept.,1974][trial court had no authority to, in effect, convene a rabbinical tribunal to grant a religious divorce]; however, the Appellate Division, Second Department has held that fashioning awards of maintenance or equitable distribution is not an [*12]impermissible interference with religion in circumstances where the refusal to remove a barrier to remarriage resulted in adverse economic consequences (see Mizrahi-Srour v Srour, 138 AD3d 801 [2 Dept.,2016]; Pinto v Pinto, 260 Ad2d 622 [2 Dept.,1999]; Schwartz v Schwartz, 235 AD2d 468 [2 Dept.,1997]). And DRL 236(B)(o) recognizing that the religious divorce is not automatic upon civil divorce and that the refusal to provide a religious divorce can have significant economic consequences on parties and children of the marriage the Domestic Relations Law specifically provides that the Supreme Court can consider "where appropriate" "the effect of a barrier to remarriage" when considering any equitable distribution [DRL 236(B)(5)(h)] and/or maintenance awards [DRL 236(B)(6)(o)]. 
Similarly, the subsequent termination of a religious marriage does not necessarily terminate any separate marriage recognized by the State of New York pursuant to DRL 12. To hold, as the husband asks this Court to do, that religious courts can unilaterally and retroactively terminate marriages recognized by the State of New York pursuant to DRL 12 would be to hold counter to the myriad of cases favoring the strong presumption of marriage and the "peculiar character" of that relationship.
Here, it appears that the husband sought and possibly obtained invalidation of the parties' religious marriage; yet that fact is of no consequence to whether the State of New York continues to recognize a marriage between the parties based on the facts presented including that there was a child born during the marriage and that neither party had any knowledge that the person who solemnized the ceremony may have lost authorization to do so. Nor is there any legally significant conflict between the husband's position related to the status of the religious marriage as allegedly determined by the rabbinical court and the wife's request that this Court grant a divorce of the separately existing civil marriage: here, both parties desire to end any marital relationship that may exist between them and to move on with their respective lives.[FN14]
 
Similarly, for the Court to adopt the husband's theory would, in effect, grant religious institutions the right to unilaterally and retroactively "invalidate" marriages previously recognized by the State of New York pursuant to DRL 12. This would result in destabilization of the peculiar relationship of marriage in the State of New York.
The Court's Obligation To Protect The Best Interests of Children
Critically important in the facts before this Court is that there is a child, who is now almost nine (9) years old, born during the marriage. That child lived a lifestyle that included the financial support of the marriage. Under the facts and circumstances presented, the child's financial future would be prejudiced if the Court were to adopt defendant's attempt to avoid any financial responsibility for maintenance and equitable distribution by way of obtaining a religious divorce and denying the existence of a legally [*13]recognizable civil marriage after receiving the benefit of that status for nearly a decade.
Here, such a ruling would result in prejudice to the child of the marriage who would be deprived of any financial benefits of potential award of equitable distribution of his parents' nearly ten (10) year marriage. There is no such superseding authority over civil marriage and to hold otherwise would be wholly inconsistent with the United States Constitution, the New York State Constitution, the Domestic Relations Law and this Court's obligation to protect the best interests of children under the doctrine of parens patriae (see generally People ex rel Herzog v. Morgan, 287 NY 317, 320 [1942]; see also Matter of Sayeh R., 91 NY2d 306 [1997]). The Court recognizes and respects the right of religious institutions over the issue of religious marriage. The Court need not determine if there is a religious marriage or the validity of any "invalidation" obtained by the husband: here, the Court only need determine if there is a marriage which was and continues to be recognized by the State of New York.
This Court rejects defendant's self-serving view of the effect of any late-obtained invalidation of the parties' religious marriage between the parties on the legal status of the marriage between the parties that is recognized by the State of New York. To hold, as defendant proposes, would be inconsistent with the strong public policy to recognize marriage in the State of New York, particularly where there are children born into the marriage (see Spalter, 2024 WL 367147). 
The Court further rejects defendant's contention that there would be no prejudice to the plaintiff-wife and the parties' child for the Court to find that there is no marriage between the parties that is recognized by the State of New York. It is clear from Spalter (supra), and the myriad of similar cases spanning more than a hundred years that the State of New York has a strong public policy interest in maintaining predictability and stability for parties and, especially, for children born into those unions. The parties voluntarily engaged in a religious ceremony which they intended to comport with their religious tradition and which they intended and believed resulted in a marriage that was also recognized by the State of New York and for many years the parties relied on that understanding and held themselves out as married. Here, defendant's own action in commencing and litigating a prior divorce action evidence his express understanding that the parties' marriage was recognized by the State of New York.[FN15]
 
This Court recognizes that adopting defendant's theory would, in effect, render civil courts in the State of New York without jurisdiction to determine important issues involving children — including custody and related financial issues  wherever — through no intent, knowledge or misdeed of the parents — parties discovery years into their marital life that there may have been some previously unknown procedural defect in the form of the solemnization ceremony. To so hold would be contrary to well-established principles [*14]of New York law including the strong presumption of marriage, particularly where children are involved and the long line of Constitutional case law recognizing the "peculiar character" of the marital relationship between parties and the State where a civil marriage is found to exist.
Summary Judgment and Dismissal
Defendant seeks summary judgment and dismissal of plaintiff's cause of action seeking a divorce on the basis that there can be no cause of action for a divorce because the parties are not married.
Based upon the herein-above analysis and consistent with the United States Constitution and New York controlling law, the husband's motion to dismiss and for summary judgment is denied. The wife's cause of action for divorce is entitled to adjudication pursuant to DRL 12.
Sanctions
The husband contends that the wife filing a divorce action in Supreme Court after the rabbinical court declared that there was no religious marriage was frivolous conduct and, therefore, sanctionable. He also contends that the wife was forum shopping because the parties are already litigating child support and custody in Kings County Family Court and, he contends, that she only filed this action in Supreme Court because she was "unhappy with the amount of money the family court [sic] was awarding her". He declares that the wife "is a mentally ill pathological liar" [NYSCEF #97, p. 5, # 34).The husband contends that the wife is the monied spouse and that her "bad faith conduct in forum shopping for a better result in a case she knows has no merit, warrants the imposition of sanctions in the amount of $26,500 (the amount I have paid so far in legal fees)" [NYSCEF #97, p.9, #56].
The husband's request for sanctions is denied on these applications without prejudice. Pursuant to 22 NYCRR 130—1.1, sanctions may be imposed against a party or the attorney for a party for frivolous conduct (see 22 NYCRR 130—1.1[b]). Conduct is frivolous if it is completely without merit in law or fact and cannot be supported by a reasonable argument for the extension, modification, or reversal of existing law; it is taken to primarily delay or prolong the resolution of the litigation, or harass or maliciously injure another; or it asserts material factual statements that are false (see 22 NYCRR 130—1.1 [c]; see generally U.S. Bank National Association v. Jack, 219 AD3d 1369 [2 Dept.,2023]; see also Crudele v. Price, 218 AD3d 539 [2 Dept.,2023]). 
In making the determination of whether an application was frivolous under 22 NYCRR 130-1.1, it is well-established that the court must consider the circumstances under which the conduct took place and whether or not the conduct was continued when its lack of legal or factual basis was apparent [or] should have been apparent (see Marrero v. New York City Transit Authority, 150 AD3d 1097 [2 Dept.,2017]; Finkelman v. SBRE, LLC, 71 AD3d 1081, 896 NYS2d 897, 898 [2 Dept.,2010], quoting Glenn v. Annunziata, 53 AD3d 565, 566, 861 N.Y.S.2d 769 [2 Dept.,2008], quoting 22 NYCRR [*15]130—1.1[c]).
Having considered all the facts and circumstances and having granted the wife's application to maintain the action for divorce there is no basis on the record before the Court to grant the husband's request to find that the wife's request for a divorce was without merit within the meaning of 22 NYCRR 130-1.1. Rather, the Court denies the husband's request for a summary judgment and dismissal finding that there is a marriage between the parties recognized by the State of New York and therefore either party could file an action seeking divorce of that marriage. There is no basis for the Court to find that the wife filed the action for divorce in Supreme Court "primarily to delay or prolong the resolution of the litigation, or to harass or maliciously injure another": clearly, significant legal questions related to whether a marriage existed between the parties that was recognized by the State of New York regardless of the continued existence of the prior religious marriage. There is also no indication at this time that the wife's application asserted "material factual statements that are false." The husband's application for sanctions against the wife for frivolous conduct is denied.
Order of Protection
There have been orders of protection in favor of the wife against the husband issued by the Family Court and Criminal Court in separate proceedings prior to the commencement of this divorce action. 
In March 2023, at the disposition in the Kings County Family Court Article 10 proceeding brought by ACS against the defendant-father, the parties' nine (9) year old child was released to the plaintiff-mother's under ACS supervision for six (6) months and ordered the defendant-father to, inter alia, complete parenting and batter's accountability programs and ordered therapeutic visits [NYSCEF #26]. The Family Court also granted an order of protection in favor of the child and the mother dated March 13, 2023 which expired on September 12, 2023 [NYSCEF #67]. Plaintiff contends that defendant has not sought visitation with the parties' child since September 2023 but she is concerned about the emotional impact on the child if the defendant attempts to see the child outside a therapeutic setting given the alleged supervised parenting access history in the recent Family Court proceeding [NYSCEF #71, p. 6].[FN16]

Plaintiff contends that in September 2023, the Kings County District Attorney's office sought an indictment of defendant for incidents of violence allegedly perpetrated against the plaintiff-wife and that as a result the defendant was arrested and arraigned on or about October 16, 2023 and that a criminal order of protection was issued in favor of her against [*16]defendant but that it did not include the parties' child [NYSCEF #82].[FN17]

On November 14, 2023, plaintiff filed an ex parte order seeking, inter alia, an order of protection [NYSCEF #70]. This Court issued a temporary order of protection mirroring the existing order of protection from Kings County Family Court. That temporary order of protection has been continued, on consent of the parties, until March 19, 2024 [NYSCEF #134].[FN18]
 Defendant initially sought dismissal of the temporary order of protection and the Court was willing to hold a hearing but the defendant then consented to continuation of the temporary order of protection. 
Plaintiff contends in her affidavit date November 14, 2023 that "[o]ver the years, Defendant made multiple deliberate and specific threats to my life, and threatened to kill our child. On many occasions, he assaulted me in the presence of the child" [NYSCEF #71, p. 2]. She alleged that on:
 one incident, Defendant locked the child (who was not yet four years old) in another room while he kicked me as I was on the floor. I heard the child crying and calling out for me. When he was finally released, he saw me on the floor and ran to me. Another time, I was holding our child, when Defendant pulled me away from the child, cursing at me, and calling me a "slut" in Russian. He hit me in the face, resulting in a nosebleed and a busted lip, which he deemed to be 'discipline.'" [NYSCEF #71, p. 2-3].
Plaintiff contends that on or about November 1, 2021 she arrived home and found that defendant had left the parties' six (6) year old child home alone. She avers that when defendant returned home she confronted him about leaving the child unattended and that "he hit me in the presence of the child" who "ran to get help from the neighbors" [NYSCEF #71, p. 3]. She avers that she "suffered a split lip and a bruise, and was taken to a hospital and a police report was made" which resulted in ACS opening an Article 10 case against defendant in Kings County Family Court [NYSCEF #71, p. 3; NYSCEF #75, ACS petition neglect case against defendant]. She contends that thereafter the parties' child was resistant to participating in supervised parenting time and that it repeatedly took "ACS caseworkers a full thirty minutes" to convince the child to enter "the visitation room with Defendant" [NYSCEF #71, p. 4]. She contends that the child is in ongoing "trauma therapy" [NYSCEF #71, p. 6] and that in January 2022 the court appointed attorney for the child in Family Court filed an order to show cause to suspend supervised parenting time between the child and the defendant [NYSCEF #76].
She avers that in February 2022 the parties' child "uncharacteristically refused to go to school" and express concern that "he would see his cousins there" again because they had "approached him directly to give him messages from Defendant" [NYSCEF #71, p. 5].
Plaintiff contends in her affidavit dated November 14, 2023 [NYSCEF #71, p. 7] that:
Based on the extensive history of abuse and the trauma that [the child] witnessed and still experiences relating to his father, I believe that he should also have the benefit of the order of protection. Defendant has previously threatened the child and engaged in domestic violence when [the child] was present. As a result of Defendant's actions, the Child could have been injured himself, and indeed, ACS brought a case against Defendant due to his abuse and neglect of the child. Therefore, I am respectfully requesting that this Court issue an Order of Protection that covers both of us, as requested in the Verified Complaint in this matter.
As previously herein determined, defendant's contention that the Court has no jurisdiction to hear plaintiff's request for an order of protection because there is no jurisdiction for her to maintain a divorce action in Supreme Court is misplaced [NYSCEF #110, p. 2]. 
Defendant's contention that plaintiff is seeking to "re-litigate" issues related to prior applications for orders of protection sought by the Administration for Children Services on behalf of the plaintiff and that it is improper for the plaintiff to now seek another order of protection from Supreme Court because the prior applications were dismissed from criminal court or the prior orders of protection expired.[FN19]
 He contends that the plaintiff "seeks a new order of protection on a case that was already disposed of" [NYSCEF #110, p. 3] and that the allegation raised by plaintiff in support of her application for an order of protection have "already been resolved in prior litigation — inclusive of criminal court dismissal and family court dispositions" [NYSCEF #110, p. 4]. She argues that:
 defendant is entitled to closure and it is entirely unfair for [plaintiff] to
wait for the expiration of the OOP in a family court case that is now over,
to come into a different forum — regurgitating the same fact pattern of the disposed case — and then get a brand new order of protection [NYSCEF #110, p. 4].
Plaintiff contends that she requested an order of protection in March 2023 before many of the alleged incidents that were involved in the criminal order of protection took place and that the Supreme Court should hear the order of protection because the prior criminal order of protection expired in November 2023 [NYSCEF #114, p. 7]. Plaintiff contends that there are new facts and circumstances warranting a new order of protection that have not been adjudicated between the parties elsewhere and/or that there is a basis for a civil order of protection. 
Defendant's procedural objections to the Supreme Court hearing plaintiff's application for an order of protection based upon his theory that there is no jurisdiction because there is no marriage is without merit inasmuch as the Court found herein above that there is a marriage recognized by the State of New York pursuant to DRL 12 that was not retroactively dissolved even if defendant obtained a legitimate "invalidation" of the separate religious marriage between the parties. 
This argument is moot at this time inasmuch as the Court has determined herein that there is a marriage between the parties recognized by the State of New York. 
The Court notes that the prior order of protection was sought by ACS, not by plaintiff herself. This does not preclude the plaintiff from also seeking an order of protection.
Furthermore, defendant's remaining contention that even if the Supreme Court has jurisdiction to hear the divorce action the Supreme Court should decline to hear plaintiff's application for an order of protection because he allegedly has had no contact with her for "years" is not supported by the statute. Section 812 of the Family Court Act states that, as relevant here, "In any proceeding pursuant to this article, a court shall not deny an order of protection, or dismiss a petition, solely on the basis that the acts or events alleged are not relatively contemporaneous with the date of the petition, the conclusion of the fact-finding or the conclusion of the dispositional hearing."
The Court must schedule an evidentiary hearing on plaintiff's application for an order of protection. At the evidentiary hearing, the parties will have the opportunity to offer sworn testimony and offer evidence subject to proper objections and cross-examination related to the facts and circumstances of plaintiff's application for an order of protection. The temporary order of protection will be continued and the matter will be set down for a hearing on the wife's request for an order of protection.
Inasmuch as plaintiff also seeks an order of protection for the parties' child, the Court will hear the parties' positions on whether the Court must appoint an attorney for the child and, if so, the apportionment of the fees for the attorney for the child at the next court appearance which is scheduled as detailed below.
Consolidation
Prior to filing this action in Supreme Court, plaintiff-herein filed a support petition [November 10, 2021; NYSCEF #20] and a custody petition [December 20, 2021; [*17]NYSCEF #21] in Kings County Family Court.[FN20]
 On January 18, 2023, Kings County Family Court issued a temporary order of support whereby defendant is to pay plaintiff $1,016 monthly for basic child support [NYSCEF #22].
On July 7 2023, plaintiff filed an order to show cause seeking in Supreme Court, inter alia, consolidate the pending custody and support petitions in Family Court Kings County which were scheduled for continued appearances on July 12, 2023 [NYSCEF #23] into the divorce action filed by plaintiff in Supreme Court, Kings County. Plaintiff also sought a stay of the ongoing support proceeding in Family Court pending ruling on the application to consolidate [NYSCEF #19]. That order to show cause was signed by the previously assigned Justice on July 12, 2023 [NYSCEF #31]. Defendant opposed consolidation on a theory that "the Supreme Court lacks the authority to consolidate pending family court matters into a purported divorce action that is doomed for dismissal" [NYSCEF #85].
There is a strong public policy to consolidate related proceedings (see generally Giasemis v Giasemis, 139 AD3d 794 [2 Dept.,2016]) especially where there are common questions of fact and law and the possibility of inconsistent decisions if two courts consider the same issues (see Millard v Millard, 44 AD2d 812 [1 Dept.,1974]). In the interest of judicial economy and consistency of orders with regards to overlapping issues of fact and law, plaintiff's request to consolidate the Family Court support proceeding is granted (see generally Weisman c Weisman, 107 AD2d 805 [2 Dept.,1985]). The Court will upload a separate order of consolidation to NYSCEF and plaintiff's counsel is directed to service the Family Court with a copy forthwith.
Pendente Lite Relief
On August 2, 2023, plaintiff's counsel filed an order to show cause seeking pendente lite relief" [NYSCEF #59].:
A. Strike the Second, Third, Fourth, Fifth, and Seventh Defenses asserted in
Defendant's Answer;
B. Order that Defendant pay to Plaintiff, during the pendency of this action, basic child support (including retroactive support) as may be determined consistent with Domestic Relations Law § 236 (7-a), payable via the Support Collection Unit;
C. Order that Defendant pay current and retroactive pro rata shares of the cost of unreimbursed health care including therapy, pharmaceutical, dental and optical expenses, education, and childcare expenses pursuant to Domestic Relations Law § 240;
D. Order that Defendant pay to Plaintiff, during the pendency of this action,
maintenance and retroactive maintenance as may be determined consistent with Domestic Relations Law § 236 Part B (5-a), payable via the Support Collection Unit; and
E. Grant Plaintiff such other and further relief as the Court deems just and proper.
The wife provided two W-2s from 2022 reflecting she earned gross income of $124,748.50 annually [NYSCEF #41, p. 17-18]. She contends that her income alone is insufficient for her to support the parties' child and that the husband should be required to pay pendente lite maintenance in addition to the temporary basic child support order from Family Court. She also argues that the temporary basic child support order from Family Court should be modified and that any awards of pendente lite support should be calculated using the imputed sum from the written decision after trial in the prior action wherein the Court rejected the husband's position that he could not afford to pay child support and found that he could earned in excess of $400,000 annually (see R.I. v. T.I., 60 Misc 3d 1226(A) [Kings County, August 17, 2018]). Plaintiff, a physician's assistant, avers that throughout the marriage including after the parties reconciled following the prior discontinued divorce action commenced by the husband that she assisted the husband in his medical business and that she believes his annual income "is at least $450,000" [NYSCEF #34]. Plaintiff's affidavit of net worth dated June 26, 2023 includes her two 2022 W-2 statements [NYSCEF #41].[FN21]
 Neither party provided copies of their 2022 tax returns or updated financial documentation from 2023.
The husband disputes the wife's rendition of his financial circumstances: he contends that her allegations and attempts to obtain orders of protection against him have "ruined my ability to generate substantial income" [NYSCEF #97, p. 9, #59]. He contends that as a result of the plea deal he entered into whereby he did not admit guilt but accepted a finding of neglect on consent that he is unable to work in many hospitals and emergency rooms as he did before because he may encounter a child patient which would violate the terms of his plea deal. He avers that his ability to earn money has been limited. The husband contends that the wife makes more money than he does now. The husband's 2022 W-2 reports gross income of $82,471.60 [NYSCEF #46]. 
This Court has fully considered the temporary maintenance guidelines and statutory factors in DRL §236(B)(5-a)[effective October 25, 2015]). 
The wife's attempt to resurrect the Court's imputation of income to the husband from the prior actionis misplaced: she voluntarily discontinued that action with prejudice and the Court conducted an extensive allocution on the record where she was represented by counsel. 
Defendant contends that his income has been greatly reduced due to his plea bargain in the Article 10 abuse and neglect proceeding because, he contends, he cannot work in many areas of his profession because he would risk violating the terms of that plea by being in contact with children.
Based upon the limited financial information available to the Court in the plaintiff's application, which is limited to the parties' respective 2022 W-2 forms the [*18]temporary maintenance guidelines calculation is as follows:
As of March 1, 2024, the current cap for the temporary maintenance guidelines calculation is $228,000 subject to any deviation either upward or downward pursuant to the factors enunciated in DRL 236(B)(5)(h)(1) (a-m).
Here, based on the parties' 2022 W-2 statements, the plaintiff is the more monied spouse and would be the payor. Utilizing the plaintiff's gross income of $124,748.50 ($110,335.92 after subtracting FICA of $9,829.64[FN22]
 and NYC taxes of $4,582.94[FN23]
) and defendant's gross income of $82,471.60 ($73,096.20 after subtracting FICA of $9,829.64 and NYC taxes of $3,066.31) and the temporary maintenance guidelines, the calculation provides as follows: 1st Calculation: 30% of the payor's income up to and including the cap ($33,100.78) - 20% of the payee's income ($14,619.24) = $18,481.54; 2nd Calculation: Payor's income up to and including the cap ($110,335.92) + Payee's income ($73,096.20) = Combined income ($183,432.12). 40% of combined income $183,432.12 x .40 = $73,372.85) - Payee's income ($73,096.20) = $276.65. LOWER OF THE TWO RESULTS: $276.65 annually; $23.05 monthly; $5.32 weekly to the defendant.
There is no basis, at this time, for a pendente lite award of maintenance to the plaintiff based on the financial information before the Court at this time which is limited to the parties' 2022 W-2 statements. 
The Court notes that the parties' child is in the custody of the plaintiff based on the Family Court Article 10 proceeding and there is a temporary order of basic child support from Family Court which appears based upon the financial information from the parties' 2022 W-2s. That temporary basic child support order dated January 18, 2023 of $1,016 monthly is continued [NYSCEF #22].
The Court notes that a preliminary conference must be held and a schedule for full financial discovery must be set. The plaintiff's application for pendente lite spousal support is denied without prejudice to future application if such is appropriate especially once affidavits of net worth and prior tax returns are provided in discovery.
Conclusion
Plaintiff's application seeking pendente lite relief [mot. seq. #4] is denied to the extent.
Plaintiff's application for an order of protection [mot. seq. #5] is granted to the extent.
Defendant's application seeking summary judgment and dismissal of the divorce action [mot. seq. #6] is denied.
All relief not specifically granted herein is denied without prejudice.
The parties and counsel shall appear for an in-person preliminary conference on [*19]May 7, 2024 at 10:00 a.m.. At that time, the Court will hear the parties' positions on the appointment of an attorney for the child and apportionment of the cost of any such appointment and to set a date for a hearing on the order of protection.
This shall constitute the decision and order of the Court.
ENTER:
Hon. Jeffrey S. Sunshine

Footnotes

Footnote 1: As noted in the decision after the trial on in the prior action: During the litigation the [husband] sought DNA testing of the parties' infant child, who was born after the [husband] filed for divorce (see R.I. v. T.I., 51 Misc 3d 1215(A) (NY Sup. Ct. 2016) [April 22, 2016]). The Court further noted in the written decision after trial on the financial issues in the prior action that, as of August 2018 "[i]t was undisputed that the plaintiff has never seen the child, who was born in October 2015, and he has never sought parenting time or any access to the child during this litigation" (R.I. v. T.I., 60 Misc 3d 1226(A), 14 [Kings County, 2018]. At that time, the parties' child was almost three (3) years old. 

Footnote 2: In that action, the Court found defendant-wife's testimony credible that the plaintiff-husband locked her out of the marital residence while she was pregnant with the parties' child and relocated all of the parties' possessions without her knowledge or consent and that he did not see the child from the time he was born and did not seek any custody or access. The Court noted that the plaintiff-husband had refused to see the child since he was born nearly three (3) years prior and had not sought custody or any parenting time with the child throughout the litigation.

Footnote 3: The Court granted the husband a divorce pursuant to DRL 170(7) upon compliance with DRL 253 or, if plaintiff failed to comply with DRL 253 by removing any barriers to remarriage within ten (10) days of service of notice of entry of the decision after trial, the defendant (the plaintiff herein) was granted the right to settle a judgment of divorce based upon her pleadings. 

Footnote 4: In the decision after trial on the financial issues, the Court found that the defendant-wife:
 testified credibly and compellingly regarding the allegations of domestic violence and overt power imbalance imposed upon her by the [husband]. [The husband]'s acts of violence,degradation and humiliation are of great concern" and that the husband " is and has been the monied spouse and the record at trial established that he has abused his greater economic strength to attempt to impose his will on the [wife] or to punish her for what he believed was her non-compliance with his wishes during the marriage" (R.I. v T.I., 60 Misc 3d 1226(A), 14 [Kings County, 2018]). 

Footnote 5: On July 25, 2023, defendant's attorney of record filed an order to show cause seeking to be relieved as counsel of record and for a stay pursuant to CPLR 321(C) for 30 days which was signed by the prior assigned justice with a return date of September 22, 2023 [NYSCEF #56]. That order to show cause was rendered moot because on of the substitution of counsel.

Footnote 6: The Court notes that defendant's counsel did not include any request that the Court grant "any such other relief as the Court may deem proper."

Footnote 7: The Court granted the application for the parties to appear virtually given the order of protection.

Footnote 8: Defendant's counsel notes that plaintiff has represented that she has not participated in any procedures before the Rabbinical Court to challenge or modify the award. There is no representation by plaintiff that she took steps to appeal that rabbinical ruling. Plaintiff contends that she did not participate in the rabbinical court proceeding and disputes defendant's allegations that she has mental illness.

Footnote 9: Clearly, a solemnized marriage that is against public policy or legally prohibited is not recognized as a valid marriage by the State of New York.

Footnote 10: For example, the Court notes that a marriage recognized by the State of New York could not result from a religious solemnization where one of the parties to the religious marriage was not capable of entering into a marriage recognized by the State due to already being married to someone else.

Footnote 11: See, New York Law Journal: "No License? No Problem (Maybe)" by Marilyn T. Sugarman [February 14, 2024].

Footnote 12: Arguably, a far stricter review may be required where the parties knew at the time of the ceremony that the person was not authorized to perform the solemnization and there must be intent, as there was here, to enter into marriage. Certainly, "marriage ceremonies" during a theatrical performance have neither a person authorized to solemnize a marriage, nor the required intent of the parties and the audience know that they are not witnessing a marriage ceremony so the requirement of DRL 10 is not satisfied.

Footnote 13: The statute places this requirement on the plaintiff as a condition of seeking affirmative relief. The legislative intent was primarily to prevent a husband, in the case of a Jewish divorce, from using the denial of a "get", i.e., a religious divorce, as a form of economic coercion in a civil divorce action (see Scheinkman Practice Commentaries DRL 253 "Removal of barriers to remarriage")

Footnote 14: Defendant's reliance on Griffin v Coughlin is misplaced inasmuch as the State is not involving itself in any religious belief or participating in a religious activity (88 NY2d 674 [1996]). Here, the status of whether the religious marriage between the parties continues or does not continue is not dispositive of the issue presented.

Footnote 15: Defendant's contention that the Court should not consider the prior divorce action he commenced in determining whether the parties have a marriage recognized by the State of New York because he was "mistaken" about his ability to obtain an invalidation of the religious marriage in 2015 is not dispositive.

Footnote 16: Plaintiff contends that the supervised visitation provider appointed in the Family Court and that the assigned supervised visitation provider provided a letter to the Family Court dated August 30, 2022 that based on the child's resistance to seeing the defendant he was "not comfortable with pursuing the therapeutic visits" and that he recommended that the child continue his weekly therapeutic sessions with his therapist" [NYSCEF #77]

Footnote 17: Plaintiff has alleged numerous acts of domestic violence including that "on or about [a date certain], which was my birthday, Defendant hit me in the face, resulting in a black eye (which he told me was a "birthday present"), and forced me to have intercourse with him without my consent" and that on other occasions he has made "specific threats to my life and threatened to kill our child" [NYSCEF #9, plaintiff's affidavit in support of order to show cause to keep her address confidential].

Footnote 18: The Court offered an evidentiary hearing on the issue of the order of protection; however, the defendant's counsel declined to proceed to an evidentiary hearing asserting that there was an on-going criminal action.

Footnote 19: A temporary order of protection may be issued in a civil proceeding despite the denial of such an order in a related criminal case (see Bodouva v Bodouva, 263 AD2d 506 [2 Dept.,1999][upheld temporary order of protection issued by Family Court after a criminal court vacated a prior temporary order of protection, based upon similar facts].

Footnote 20: In support, defendant provided an unsworn financial disclosure affidavit dated January 17, 2023 that he earned approximately $5,180 monthly in "take-home income" [NYSCEF #47].

Footnote 21: She alleges that her basic monthly expenses total $11,765 [NYSCEF #34, p. 7]. The wife's rendition of her expenses raises some questions, including an alleged "$1,000" monthly expenses for public transportation without further explanation [NYSCEF #34, p. 7]. 

Footnote 22: Social Security of $7,829.48 + $137.02 = $7,966.50 and Medicare of $1,831.09 + $32.05 = $1,863.14

Footnote 23: NYC local taxes of $4,532.64 + $50.30 = $4,582.94